IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CONCENTRIC, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| v. ) | |
| ) | |
| JACQUELYN A. MAGES and ) | |
| AMERICAN POWER SYSTEMS, LLC, ) | |
| ) | |
| Defendants. ) | |

## CONCENTRIC, LLC'S COMPLAINT

NOW COMES Plaintiff, CONCENTRIC, LLC ("Concentric"), by and through its attorneys, Masuda, Funai, Eifert & Mitchell, Ltd., and states as follows for its Complaint against Defendants JACQUELYN A. MAGES ("Mages") and AMERICAN POWER SYSTEMS, LLC ("APS"):

## PARTIES

1. Plaintiff Concentric, f/k/a/ ABT Power Management, LLC, is a limited lability company organized under the laws of the state of Texas with its principal place of business located at 3235 Levis Commons Boulevard, Perrysburg, Ohio 43551. Concentric has three (3) members: (a) Tom Cox, an individual and a citizen of the state of Ohio, (b) Chris Davanzo, an individual and a citizen of the State of Ohio, and (c) Kirk Yosik an individual and a citizen of the state of Ohio. Concentric maintains an office at 6522 North 40th Street, Milwaukee, Wisconsin 53209 (the "Milwaukee Office").

2. Defendant Mages is an individual and citizen of Wisconsin, who resides at W203 N17225 Francis Drive, Jackson, Wisconsin 53037.

3. Defendant APS is a limited liability company organized under the laws of the state of Pennsylvania with its principal place of business located at 1851 Central Place S., Suite 206, Kent, Washington 98030. APS has two (2) members: (a) Ben Gillihan, an individual and a citizen of the state of Pennsylvania, and (b) East Penn Manufacturing Co., a company organized under the laws of the state of Pennsylvania.

**JURISDICTION AND VENUE**

4. This Court has original jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a)(1) because the amount of controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists among the Parties where Concentric is a citizen of the state of Ohio, Mages is a citizen of Wisconsin, and APS is a citizen of the state of Pennsylvania.

5. Venue is proper in the U.S. District Court for Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events or omissions giving rise to the claim occurred in Milwaukee County, Wisconsin, which is within the territorial jurisdiction of this Court, and where Defendants are subject to personal jurisdiction in this Court.

**FACTUTAL ALLEGATIONS**

**A.   Mages' Employment at Concentric.**

6. Concentric is engaged in the business of selling industrial power systems, such as batteries and other power-supply equipment, for use in electric forklifts, electric vehicles, and automated-guided vehicles.

7. On or around January 1, 2019, Concentric offered Mages employment as a Reserve Power Sales employee in Concentric's Milwaukee Office and submitted an offer of employment letter (the "Offer Letter") to Mages with the Employee Agreement on Non-Competition, Non-Solicitation, and Confidentiality (collectively with the Offer Letter, the "Employment

Agreement") attached. (*See* Employment Agreement, a true and correct copy of which is attached hereto as Exhibit 1.)

8. The Offer Letter to Mages expressly states that entering into the Employment Agreement is a condition to beginning employment with Concentric. (*See id.*)

9. In consideration and as a condition of starting her employment with Concentric and the compensation provided thereto, including, but not limited to, Mages' salary and benefits, Mages executed the Employment Agreement on or around March 26, 2019. (*See id.*)

10. The Employment Agreement was entered into by Mages and ABT Power Management, LLC, as well as its successors and assigns. (*See id.*) ABT Power Management, LLC is now known as Concentric, LLC.

11. By executing the Employment Agreement, under Section 1 (the "Confidentiality Provision"), Mages "acknowledge[d] that [she] would not have access to Protected Information but for [her] employment with [Concentric,]" and accordingly, made the following promises:

> (i) ***Promise to Protect.*** Employee promises to protect and maintain the confidentiality of Protected Information while employed by Company. Employee will follow all Company policies and procedures for the protection and security of information. Employee also will immediately report to management any potential or actual security breach of loss.
> (ii) ***Promise to Return***. Employee agrees to return any and all materials reflecting Protected Information that he or she may possess (as well as all Company-owned equipment and materials) immediately upon termination of employment or upon demand by Company.
> (iii) ***Promise Not To Use Or Disclose***. Employee agrees not to use or disclose, except as required by law, any Protected Information for ***two years*** after the end of Employee's employment but only for so long as such Protected Information remains confidential and not generally known to, and not readily ascertainable through proper and lawful means.

3

(*Id.* at ¶ 1.b.) (emphasis added.)

12. The Employment Agreement defines "Protected Information" as:

> [Concentric] information not generally known to, and which is not readily ascertainable through proper means by, third parties including, without limitation, all of the following; customer lists, client lists, prospect lists, financial statements and reports, code and software and the methods and techniques to develop code and software, business processes, future market and product plans, product and service pricing, information about the performance, personal circumstances and/or compensation of other employees of [Concentric] or its affiliates, and other [Concentric] know-how and trade secrets. Protected Information includes negative know-how, which is information about what [Concentric] tried that did not work, if that information is not generally known or easily ascertainable by third parties.

(*Id.* at ¶ 1.a.(i).)

13. Furthermore, Section 1.e. of the Employment Agreement states that " the terms and conditions of this Section 1 are reasonable and necessary for the protection of [Concentric's] business and to prevent damages or loss to [Concentric] as the result of action taken by [Mages]." (*Id.* at ¶ 1.e.) Mages "acknowledge[d] that [she] could continue to actively pursue [her] career and earn sufficient compensation without breaching any of the restrictions contained in this Section 1." (*Id.*)

14. Next, Section 4 of the Employment Agreement (the "Non-Solicitation Provision") states:

> **Non-Interference with Certain Customers.** [Mages] agrees that during his or her employment with [Concentric], and for a ***period of two years*** after the voluntary or involuntary termination of employment with [Concentric] for any reason whatsoever, [Mages] shall not, either personally or in conjunction with others either (a) solicit, interfere with, or endeavor to cause any Protected Customer (as defined in the next sentence) to terminate its business with company, or (b) solicit, otherwise induce or attempt to induce any Protected Customer to obtain goods or services from another (including Employee) or sell or provide goods or services to a Protected Customer if, in either case, those goods or services are

4

> competitive with goods or services the Protected Customer obtained from [Concentric] in the 12 months preceding the termination of [Mages'] employment with [Concentric].

(*Id.* at ¶ 4) (emphasis added.)

15. A "Protected Customer" is defined in the Employment Agreement as "any customer of [Concentric] for which [Mages] or someone acting under [Mages'] direct supervision provided services or about which [Mages] received any Protected Information, in either case within the last 12 months preceding the termination of [Mages'] employment with [Concentric]." (*Id.*)

16. Finally, Section 5 of the Employment Agreement (the "Non-Compete Provision") states:

> **Non-Competition.** [Mages] agrees that he or she shall not render services or assistance to any competitor (as defined below) of the [Concentric] or of any present or future parent, subsidiary or other affiliate of the [Concentric] (collectively, "Affiliate") (a) during the term of Employee's employment with the [Concentric] or with any Affiliate, and (b) for a period of *one (1) year after the termination* of such employment if such post-employment services or assistance to a Competitor involve any of the following:
>
> (i) for an Employee whose principal business function for the Company or any Affiliate during the one year prior to the termination of Employee's employment with the [Concentric] or such Affiliate ("the Relevant Period") is sales or marketing directly to customers of the [Concentric] or such Affiliate, selling, marketing products or services competitive with those Employee sold or marketed on behalf of the [Concentric] or Affiliate for whom Employee worked, to any of the [Concentric's] or such Affiliate's customers for which Employee had responsibility or with which Employee had regular contact, whether in person or through any communications technology, at any time during the Relevant Period . . . [or]
>
> for an Employee who during the Relevant Period serves the [Concentric] or any Affiliate in a capacity not described in subsections (i) or (ii), providing services to a Competitor of the [Concentric] or such Affiliate in any capacity in which confidential

5

information of the [Concentric] or such Affiliate that Employee learned during the Relevant Period, would reasonably be considered useful to the Competitor.

(*Id.* at ¶ 5) (emphasis added.)

17. "Competitor" is defined in the Employment Agreement as any company that is:

(a) engaged in or preparing to engage in either of the following businesses in the states of North Dakota, South Dakota, Minnesota, Wisconsin, Illinois, or Iowa:

(i) reserve power battery systems utilized in the industries of telecommunications, petro chemical, healthcare, and data centers, or

(ii) industrial motive power business, including batteries and charging systems utilized in the industries of material handling, sweepers/scrubbers, personnel carriers, automated guided vehicles, and laser guided vehicles; or

(b) engaged in or preparing to engage in competition with any other business in which the Company or any Affiliate is engaged, in any state or territory of the United States in which the Company or any Affiliate is so engaged, but only if such business accounted for at least 10% of the revenues of the Company and its subsidiaries, on a consolidated basis, during the Relevant Period.

(*Id.*)

18. During Mages' employment at Concentric as a Reserve Power Sales employee, Mages received a substantial annual salary of $90,000, in addition to other employment benefits and incentives.

19. In addition to Mages' annual salary at Concentric, starting on or around January 9, 2020, Mages also received commissions on certain sales pursuant to a Quarterly Reserve Power Commission Plan. (*See* "Quarterly Reserve Power Commission Plan," a true and accurate copy of which is attached hereto as Exhibit 2.)

20. As a Reserve Power Sales employee at Concentric, Mages had unique access to and acquired Concentric's confidential information regarding the identities, contact information, purchase histories and preferences for Concentric's customers, as well as pricing information for Concentric's power-system products.

21. Mages unexpectedly resigned from Concentric on or around January 26, 2021, stating that her "personality does not fit within the Concentric culture[.]" (*See* "Mages' Resignation Letter," a true and correct copy of which is attached hereto as Exhibit 3.)

22. Shortly after her resignation, on or around February 1, 2021, Concentric sent Mages a letter asking her to return any and all Concentric property, including, but not limited to paper files and documents containing Concentric's customer information, and confidential matters still in her possession, reminding Mages of her obligations to maintain such information as confidential, and reminding Mages of her non-solicitation and non-compete obligations under the Employment Agreement. (*See* "Reminder of Obligations Letter," a true and correct copy of which is attached hereto as Exhibit 4.)

23. Mages did not respond to the Reminder of Obligations Letter in any manner, neither denying she had any such materials in her possession nor returning any such materials.

24. Upon information and belief, despite Concentric's demands to do so, Mages has failed to and refused to return Concentric's confidential information, including, but not limited to, paper files containing Concentric's confidential customer lists and customer contacts, after her resignation.

**B.** **Mages Solicited and Serviced Concentric's Customer.**

25. After Mages resigned from Concentric, Concentric discovered that Mages was contacting and servicing at least one of Concentric's customers.

7

26. On or around June 24, 2021, Concentric's customer, TDS Telecom, located in Madison, Wisconsin, sent an e-mail to Concentric inquiring whether Concentric had received a certain purchase order. (*See* "June 24, 2021 E-mail to Concentric," a true and correct copy of which is attached hereto as Exhibit 5.)

27. TDS Telecom is a "Protected Customer" because Mages provided services to TDS Telecom for Concentric "within the last 12 months preceding" her resignation. (*See* Employment Agreement, at ¶ 4.)

28. In the June 24, 2021 E-mail to Concentric, TDS Telecom revealed that it had accidentally sent it two purchase orders for Enersys SBSB14F 62AH12V FR Term Batteries (the "Batteries"), which it actually intended to submit to APS. (*See id.*)

29. APS is engaged in the business of selling power systems, such as batteries and other power supply equipment, and thus, is a direct competitor of Concentric.

30. The two orders TDS Telecom sent to APS totaled $1,728. (*See id.*)

31. Attached to the June 24, 2021 E-mail to Concentric is an e-mail chain between TDS Telecom and Mages from May 18–24, 2021 with Mages communicating on behalf of APS concerning APS fulfilling TDS Telecom's purchase orders for the Batteries. (*See* "May 2021 Emails from Mages," true and correct copies of which is attached hereto as Exhibit 6.)

32. In the May 2021 Emails from Mages, Mages is listed as the "Project Manager" for APS. (*See id.*)

33. Mages has been improperly soliciting and servicing Concentric's customer for APS's benefit and at Concentric's detriment after her resignation from Concentric in violation of Sections 4 and 5 of the Employment Agreement.

8

34. Based on this contact with Concentric's customer, Mages may be contacting other Concentric customers on APS's behalf.

35. As a result of Mages' improper solicitation and servicing of Concentric's customer, Concentric's ability to provide products and services to and collect revenue from its customer has been and will continue to be damaged.

## COUNT I – BREACH OF CONTRACT
### (Defendant Mages)

36. Concentric repeats and re-alleges the allegations set forth in Paragraphs 1–35 as if fully set forth herein.

37. The Employment Agreement between Concentric and Mages constitute a valid and enforceable contract, which Mages entered into voluntarily and in consideration for her employment at Concentric and compensation, in excess of $90,000, for the same.

38. Concentric has performed all conditions, covenants, and promises required on its part.

39. The restrictive covenants within the Employment Agreement are reasonable as to Concentric's employees and the general public, and necessary for Concentric to protect its legitimate business interest in protecting and safeguarding its confidential information from improper use for Mages' and/or a competitor's gain, and protecting and safeguarding its relationships with its customers.

40. The Employment Agreement provides a reasonable time period for its restrictive covenants as the Employment Agreement prohibits Mages from:

>    (a)    improperly using or disclosing Concentric's confidential information for a period of two (2) years after Mages' termination (the "Confidentiality Period");

(b) soliciting or interfering with a "Protected Customer" for a period of two (2) years after Mages' termination (the "Non-Solicitation Period"); and

(c) competing with Concentric in the defined territory as defined in the Employment Agreement for a period of one (1) year after Mages' termination (the "Non-Compete Period").

41. The Non-Solicitation Provision within the Employment Agreement covers a reasonable and specified territory as it prohibits Mages from soliciting, or otherwise inducing or attempting to inducing Concentric customer that Mages provided services to "within the last 12 months preceding" Mages' termination to do business with Mages or another entity.

42. The Non-Compete Provision within the Employment Agreement covers a reasonable and specified territory as it prohibits Mages from competition with Concentric with a competitor in "North Dakota, South Dakota, Minnesota, Wisconsin, Illinois, or Iowa" that is in involved in "reserve power battery systems utilized in the industries of telecommunications, petro chemical, healthcare, and data centers, or industrial motive power business, including batteries and charging systems utilized in the industries of material handling, sweepers/scrubbers, personnel carriers, automated guided vehicles, and laser guided vehicles" industries, or "in any state or territory of the United States . . . but only if [Concentric's] business accounted for at least 10% of the revenues of [Concentric] and its subsidiaries, on a consolidated basis, during the Relevant Period."

43. Mages breached the restrictive covenants contained in Employee Agreement by:

(a) failing to and refusing to return Concentric's confidential information immediately upon her resignation and upon demand by Concentric;

(b) soliciting Concentric's customer, who Mages serviced at Concentric within the last twelve months preceding her resignation, to do business with APS; and

(c) servicing such customer in competition with Concentric.

44. As a direct and proximate result of Mages' breaches of the Employment Agreement, Concentric has suffered damages relating to its ability to provide products and services to and collect revenue from its customer.

45. Moreover, Concentric will suffer irreparable and substantial harm that cannot be fully redressed through damages alone. Accordingly, temporary injunctive relief prohibiting Mages from competing with Concentric and further soliciting Concentric's Protected Customers, as defined in the Employment Agreement, is necessary to provide Concentric with complete relief.

WHEREFORE, Plaintiff Concentric respectfully requests that this Court enter judgment in its favor and against Defendant Mages and grant the following relief:

(i) Compensatory damages for the actual losses incurred due to Defendant's breaches of her Employment Agreement, in excess of $75,000;

(ii) Preliminary injunctive relief tolling the running or expiration of the Confidentiality, Non-Solicitation, and Non-Compete Periods in the Employment Agreement during the pendency of this litigation, and enjoining Mages from using or disclosing Concentric's confidential information during the Confidentiality Period, soliciting Concentric's Protected Customers, as defined in the Employment Agreement, during the Non-Solicitation period, and directly competing with Concentric for a Competitor, as defined in the Employment Agreement, during the Non-Compete Period;

(iii) Applicable interest and costs; and

(iv) Any other and further relief that the Court deems equitable and just.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
### (Defendant APS)

46. Concentric repeats and re-alleges the allegations set forth in Paragraphs 1-45 as if fully set forth herein.

47. Concentric had an existing contractual relationship with Mages, evidenced by the Employment Agreement entered into by both Concentric and Mages.

48. Defendant APS interfered with Concentric's existing contractual relationship with Mages by employing Mages in a capacity that violates her contractual obligations to Concentric within the Employment Agreement.

49. Upon information and belief, APS' interference with Concentric's contractual relationships with Mages was intentional because APS knew about the existences of the valid and enforceable contract between Concentric and Mages, including the restrictive covenants contained therein, and nevertheless interfered with Concentric and Mages' contractual relationship.

50. Accordingly, upon information and belief, APS was not justified or privileged to interfere with the existing contractual relationship between Concentric and Mages.

51. As a direct and proximate result of APS's tortious interference with Concentric's contractual relationship, Concentric has suffered damages relating to its ability to provide products and services to and collect revenue from its customer.

52. Moreover, Concentric will suffer irreparable and substantial harm that cannot be fully redressed through damages alone. Accordingly, temporary injunctive relief prohibiting APS from employing Mages in a capacity that competes with Concentric, as defined in the Employment Agreement, is necessary to provide Concentric with complete relief.

WHEREFORE, Plaintiff Concentric respectfully requests that this Court enter judgment in its favor and against Defendant APS and grant the following relief:

(i) Compensatory damages for the actual losses incurred due to Defendant APS's tortious interference with Concentric's contractual relationship with its former employee, Mages;

(ii) Requiring Defendant APS to provide Concentric with an account of profits received by APS arising from its tortious interference with Concentric's contractual relationship;

(iii) Preliminary injunctive relief tolling the running or expiration of the Non-Solicitation and Non-Compete Periods in the Employment Agreement during the pendency of this litigation, and enjoining Defendant APS from employing Mages in a capacity that directly competes with Concentric, as defined in the Employment Agreement, during the Non-Compete Period;

(iv) Applicable interest and costs; and

(v) Any other and further relief that the Court deems equitable and just.

**COUNT III – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
(Defendants Mages and APS)**

53. Concentric repeats and re-alleges the allegations set forth in Paragraphs 1-52 as if fully set forth herein.

54. Concentric had an existing contractual relationship with its customer, TDS Telecom.

55. Defendants interfered with Concentric's existing contractual relationship with TDS Telecom by soliciting and fulfilling TDS Telecom's purchase orders after Mages diverted TDS Telecom's business to APS.

56. Defendants' interference with Concentric's contractual relationships was intentional.

57. As a direct and proximate result of Defendants' tortious interference with Concentric's contractual relationship, Concentric has suffered damages relating to its ability to provide products and services to and collect revenue from TDS Telecom.

58. Moreover, Concentric will suffer irreparable and substantial harm that cannot be fully redressed through damages alone. Accordingly, temporary injunctive relief prohibiting Mages from competing with Concentric and further soliciting Concentric's Protected Customers, as defined in the Employment Agreement, is necessary to provide Concentric with complete relief.

59. Defendants' were not justified or privileged to interfere with the existing contractual relationships between Concentric and its customer.

WHEREFORE, Plaintiff Concentric respectfully requests that this Court enter judgment in its favor and against Defendants Mages and APS and grant the following relief:

(i) Compensatory damages for the actual losses incurred due to Defendants' tortious interference with Concentric's contractual relationship with its customer;

(ii) Requiring Defendants to provide Concentric with an account of profits received by Defendants arising from their tortious interference with Concentric's contractual relationships;

(iii) Preliminary injunctive relief tolling the running or expiration of the Non-Solicitation and Non-Compete Periods in the Employment Agreement during the pendency of this litigation, and enjoining Defendants from soliciting Concentric's Protected Customers, as defined in the Employment Agreement, during the Non-

Solicitation period, and directly competing with Concentric for a Competitor, as defined in the Employment Agreement, during the Non-Compete Period;

(iv) Applicable interest and costs; and

(v) Any other and further relief that the Court deems equitable and just.

## **COUNT IV – UNJUST ENRICHMENT (IN THE ALTERNATIVE TO COUNT I)**
### **(Defendant Mages)**

60. Concentric repeats and re-alleges the allegations set forth in Paragraphs 1-6, 18, 20-21, 24-26, 28-32, 34-35 as if fully set forth herein.

61. Mages voluntarily received an annual salary of $90,000, as well as other employment benefits and incentives, from March 2019 to January 2021, when she resigned from Concentric.

62. Mages received her salary and other benefits from Concentric in exchange for her promises:

(a) to be an employee of Concentric;

(b) to not improperly use or disclose Concentric's confidential information for a period of two (2) years after Mages' termination;

(c) to not solicit or interfere with Concentric's customers for a period of two (2) years after Mage's termination; and

(d) compete with Concentric for a period of one (1) year after Mages' termination.

63. Mages has been unjustly enriched at the expense and at the detriment of Concentric because she received the compensation referenced herein without keeping the aforementioned promises to Concentric.

64. The unjust, willful, and malicious actions taken by Mages in violation of her promise to Concentric include, but are not limited to:

 (a) failing to and refusing to return Concentric's confidential information immediately upon her resignation and/or upon demand by Concentric;

 (b) soliciting Concentric's customer to do business with APS; and

 (c) servicing Concentric's customer in competition with Concentric.

65. Mages is thus required to compensate Concentric for the value of her unlawful gains in connection with her actions, concluding, but not limited to, any salary and other compensation received from Concentric and any profits that Mages received from Concentric, as it would otherwise be inequitable for Mages to retain them.

WHEREFORE, Plaintiff Concentric respectfully requests that this Court enter judgment in its favor and against Defendant Mages and grant the following relief:

 (i) Requiring Defendant to provide an account of her profits received by Defendant arising from her violation of her promises to Concentric;

 (ii) Compensatory damages for the actual losses incurred due to Defendant's violation of her promises to Plaintiff;

 (iii) Applicable interest and costs; and

 (iv) Any other and further relief that the Court deems equitable and just.

## JURY DEMAND

Plaintiff Concentric hereby demands trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: August 10, 2021

                Respectfully submitted,

                **CONCENTRIC, LLC**

By:     /s/ Edward J. Underhill

                Edward J. Underhill
                Masuda, Funai, Eifert &Mitchell, Ltd.
                203 N. LaSalle Street, Suite 2500
                Chicago, Illinois 60601
                P: (312) 245-7500
                F: (312) 245-7467
                eunderhill@masudafunai.com

                *Attorney for Plaintiff*