UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CONCENTRIC, LLC,

                Plaintiff,

v.                              Case No. 2:21-cv-00937

JACQUELYN A. MAGES &
AMERICAN POWER SYSTEMS, LLC,

                Defendants.

---

# ORDER

---

**1. Background**

Defendant Jacquelyn Mages began working for Courtney Industrial Battery in March of 1991. (ECF No. 18, ¶ 1.) She worked for Courtney Industrial for twenty-eight years, until it was sold to ABT Power Management, LLC—now known as plaintiff Concentric, LLC—in 2019. (*Id.*, ¶ 4.)

When Concentric acquired Courtney Industrial, it offered Mages "a position as a 'Reserve Power Sales' representative." (ECF No. 18, ¶ 8.) Mages accepted the offer and eventually signed an Employment Agreement with Concentric. (*Id.*, ¶ 10.) The Agreement contained several provisions that are relevant here: a Non-Competition

provision, a Non-Solicitation provision, and a Confidentiality provision. (ECF No. 5 at 2; *see also* ECF No. 5-1 at 11.)

Under Section 1 of the Employment Agreement (the "Confidentiality Provision"), Mages "acknowledge[d] that [she] would not have access to Protected Information but for [her] employment with [Concentric,]" and, accordingly, made the following promises:

> (i) **Promise to Protect.** Employee promises to protect and maintain the confidentiality of Protected Information while employed by Company. Employee will follow all Company policies and procedures for the protection and security of information. Employee also will immediately report to management any potential or actual security breach of loss.
>
> (ii) **Promise to Return.** Employee agrees to return any and all materials reflecting Protected Information that he or she may possess (as well as all Company-owned equipment and materials) immediately upon termination of employment or upon demand by Company.
>
> (iii) **Promise Not To Use Or Disclose.** Employee agrees not to use or disclose, except as required by law, any Protected Information for two years after the end of Employee's employment but only for so long as such Protected Information remains confidential and not generally known to, and not readily ascertainable through proper and lawful means.

(ECF No. 5-1, ¶ 1.b.)

The Employment Agreement defines "Protected Information" as:

> [Concentric] information not generally known to, and which is not readily ascertainable through proper means by, third parties including, without limitation, all of the following; customer lists, client lists, prospect lists, financial statements and reports, code and software and the methods and techniques to develop code and software, business processes, future

market and product plans, product and service pricing, information about the performance, personal circumstances and/or compensation of other employees of [Concentric] or its affiliates, and other [Concentric] know-how and trade secrets. Protected Information includes negative know-how, which is information about what [Concentric] tried that did not work, if that information is not generally known or easily ascertainable by third parties.

(ECF No. 5-1, ¶ 1.a.(i).)

Section 4 of the Employment Agreement (the "Non-Solicitation Provision") states:

> **Non-Interference with Certain Customers.** [Mages] agrees that during his or her employment with [Concentric], and for a period of two years after the voluntary or involuntary termination of employment with [Concentric] for any reason whatsoever, [Mages] shall not, either personally or in conjunction with others either (a) solicit, interfere with, or endeavor to cause any Protected Customer (as defined in the next sentence) to terminate its business with company, or (b) solicit, otherwise induce or attempt to induce any Protected Customer to obtain goods or services from another (including Employee) or sell or provide goods or services to a Protected Customer if, in either case, those goods or services are competitive with goods or services the Protected Customer obtained from [Concentric] in the 12 months preceding the termination of [Mages'] employment with [Concentric].

(ECF No. 5-1, ¶ 4.) A "Protected Customer" is defined in the Employment Agreement as "any customer of [Concentric] for which [Mages] or someone acting under [Mages's] direct supervision provided services or about which [Mages] received any Protected Information, in either case within the last 12 months preceding the termination of [Mages's] employment with [Concentric]." (*Id.*)

Finally, Section 5 of the Employment Agreement (the "Non-Compete Provision") states:

> **Non-Competition.** [Mages] agrees that he or she shall not render services or assistance to any competitor (as defined below) of the [Concentric] or of any present or future parent, subsidiary or other affiliate of the [Concentric] (collectively, "Affiliate") (a) during the term of Employee's employment with the [Concentric] or with any Affiliate, and (b) for a period of one (1) year after the termination of such employment if such post-employment services or assistance to a Competitor involve any of the following:
>
> (i) for an Employee whose principal business function for the Company or any Affiliate during the one year prior to the termination of Employee's employment with the [Concentric] or such Affiliate ("the Relevant Period") is sales or marketing directly to customers of the [Concentric] or such Affiliate, selling, marketing products or services competitive with those Employee sold or marketed on behalf of the [Concentric] or Affiliate for whom Employee worked, to any of the [Concentric's] or such Affiliate's customers for which Employee had responsibility or with which Employee had regular contact, whether in person or through any communications technology, at any time during the Relevant Period . . . [or]
>
> (iii) for an Employee who during the Relevant Period serves the [Concentric] or any Affiliate in a capacity not described in subsections (i) or (ii), providing services to a Competitor of the [Concentric] or such Affiliate in any capacity in which confidential information of the [Concentric] or such Affiliate that Employee learned during the Relevant Period, would reasonably be considered useful to the Competitor.

(ECF No. 5-1, ¶ 5.) "Competitor" is defined in the Employment Agreement as any company that is:

> (a) engaged in or preparing to engage in either of the following businesses in the states of North Dakota, South Dakota, Minnesota, Wisconsin, Illinois, or Iowa:

4

(i) reserve power battery systems utilized in the industries of telecommunications, petro chemical, healthcare, and data centers, or

(ii) industrial motive power business, including batteries and charging systems utilized in the industries of material handling, sweepers/scrubbers, personnel carriers, automated guided vehicles, and laser guided vehicles; or

(b) engaged in or preparing to engage in competition with any other business in which the Company or any Affiliate is engaged, in any state or territory of the United States in which the Company or any Affiliate is so engaged, but only if such business accounted for at least 10% of the revenues of the Company and its subsidiaries, on a consolidated basis, during the Relevant Period.

(*Id.*)

As a Reserve Power Sales representative, Mages sold power systems, including commercial batteries, to Concentric customers across the Midwest. (ECF No. 5 at 1.) Her position afforded her "access to Concentric's confidential information, including … information concerning Concentric's power-system products, price points, customer identities, customer contacts, and customer purchase history and preferences." (*Id.* at 1-2; ECF No. 5-1, ¶ 12.) She held that position for two years before resigning, telling Concentric "that her personality did not fit with the Concentric culture." (ECF No. 18, ¶ 13.)

Mages is now employed at defendant American Power Systems, Inc., a company that, like Concentric, sells "power systems and other power supply equipment." (ECF No. 5 at 8.) On May 18, 2021, a representative from a customer called TDS Telecom emailed Mages and one of her American Power co-workers to ascertain the status of a

battery purchase order. (ECF No. 5-1 at 58.) Mages replied with a ship date. (*Id.*) TDS responded, saying it needed the batteries sooner. (*Id.*) Mages explained that the "factory is back logged and has parts issues as well as labor issues" and that "some batteries are 16-20 weeks out." (*Id.* at 57.) TDS asked to cancel the order (*Id.* at 56), and Mages did so (*Id.*).

Concerned that it had placed duplicative orders, with two apparently going to American Power and one to Concentric, TDS emailed Concentric. (ECF No. 5-1 at 40-41.) From those emails Concentric learned that one of TDS's purchase orders had gone to Mages at American Power. (*Id.* at 40.)

Concentric consequently brought this action against Mages and American Power. Concentric alleges that Mages breached her Employment Agreement by "failing to and refusing to return Concentric's confidential information immediately upon her resignation and upon demand by Concentric; soliciting Concentric's customer, who Mages serviced at Concentric within the last twelve months preceding her resignation, to do business with [American Power]; and servicing such customer in competition with Concentric." (ECF No. 1, ¶ 43.) It also alleges that American Power tortiously interfered with its contract with Mages, and that Mages and American Power tortiously interfered with its contract with TDS Telecom. (*Id.* at 12-14.)

On August 12, 2021, two days after filing its complaint, Concentric moved for a temporary restraining order and a preliminary injunction, arguing that both "are

necessary to ensure that Concentric will not suffer further irreparable harm by Mages' failure and refusal to honor her obligations under the Employment Agreement until such time as a judgment may be entered on the merits." (ECF No. 5 at 3.)

**2. Applicable Law**

"A preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)). The same could be said of a temporary restraining order. *See Faust v. Vilsack*, 519 F. Supp. 3d 470, 474 (E.D. Wis. 2021) ("A temporary restraining order 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" (quoting *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005))). Indeed, "the standards for granting a temporary restraining order and preliminary injunctions are the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n. 5 (N.D. Ill. 2019) (internal citations omitted).

The court's assessment of whether to grant a preliminary injunction (or a temporary restraining order) proceeds in two phases. "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell*, 990 F.3d at 544-45 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). The "some likelihood of succeeding on the merits" standard represents a "low threshold." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (internal citations omitted). "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

The second phase is the balancing phase. *Cassell*, 990 F.3d at 545 (quoting *Girl Scouts*, 549 F.3d at 1086). "[T]he court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest.'" *Girl Scouts*, 549 F.3d at 1086 (internal citation and quotation marks omitted) (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)).

The court applies a sliding scale approach to weigh the movant's irreparable harm against the harm to the non-movant if the injunction were granted. *Girl Scouts*, 549

F.3d at 1086. "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). The court should also consider the effect of an injunction on non-parties, i.e., on the public. *Id.*

"Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts*, 549 F.3d at 1086 (quoting *Lawson Prods.*, 782 F.2d at 1436).

**3. Likelihood of Success, Irreparable Harm, and Inadequacy of Remedy at Law**

**3.1.1. Likelihood of Success**

Concentric argues that it is likely to succeed on the merits of its claim for breach of the Employment Agreement because the restrictive covenants in Mages's Employment Agreement are enforceable and because it can show that she breached those covenants. (ECF No. 5 at 9-15.) Mages and American Power dispute that the restrictive covenants in Mages's Employment Agreement are enforceable and state that, even if they were, Concentric has not shown that Mages breached them. (ECF No. 17 at 11-17.)

Under Wisconsin law, restrictive covenants are enforceable if they are reasonable and supported by consideration. *See Runzheimer Int'l, Ltd. v. Friedlen*, 2015 WI 45, ¶ 43,

9

362 Wis. 2d 100, 121, 862 N.W.2d 879, 889 ("Restrictive covenants are enforceable in Wisconsin as long as [they] are reasonable."); *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 50, 319 Wis. 2d 274, 299, 767 N.W.2d 898, 910 ("In fact, employers may not compel their existing employees to sign restrictive covenants without additional consideration." (citing *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 837-39, 520 N.W.2d 93, 96-97 (Ct. App. 1994))). To be considered reasonable,

> a restrictive covenant must: (1) be necessary for the protection of the employer, that is, the employer must have a protectable interest justifying the restriction imposed on the activity of the employee; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy.

*Star Direct*, 2009 WI, ¶ 20, 319 Wis. 2d at 288, 767 N.W.2d at 905 (citing *Lakeside Oil Co. v. Slutsky*, 8 Wis. 2d 157, 162–67, 98 N.W.2d 415 (1959)).

Concentric argues that the restrictive covenants in Mages's Employment Agreement satisfy all five requirements and are therefore reasonable and enforceable. (ECF No. 5 at 10.) Mages and American Power respond that the Non-Compete provision fails to satisfy the first, fourth, and fifth requirement and is therefore unreasonable and unenforceable. (ECF No. 17 at 12.) Mages and American Power also argue that the restrictive covenants are unenforceable because they are unsupported by consideration. (*Id.* at 11-12.)

On the issue of consideration, Mages and American Power argue that, because Mages began her employment with Concentric without executing the Employment

Agreement, which she only executed two months later, the Agreement and its covenants fail "for lack of consideration." (ECF No. 17 at 11.) Concentric responds that, even though Mages worked for a couple of months before executing the Employment Agreement, her employment was still "strictly conditioned upon [her] signing the Employment Agreement" and "Concentric only allowed Mages' continued employment while negotiating the terms of the Agreement." (ECF No. 21 at 4; ECF No. 21-1, ¶¶ 12-13.)

If Mages's employment was "strictly conditioned upon [her] signing the Employment Agreement," then the Agreement's covenants were supported by consideration. *Cf. Runzheimer*, 2015 WI, ¶ 46, 362 Wis. 2d at 122, 862 N.W.2d at 890. Concentric has presented some evidence to show that Mages's employment was conditioned on her signing the Agreement, including a declaration from Concentric's general counsel and chief administrative officer stating that Mages and Concentric were negotiating the specifics of the Agreement during the time between Mages's start date and the day she signed the Agreement and that she would have been terminated had she not eventually signed the Agreement. (ECF No. 21-1, ¶¶ 12-13.) As such, there is a likelihood that Concentric will be able to show that the Agreement's covenants were supported by consideration.

As for the reasonableness of the restrictive covenant, Concentric argues that the Non-Compete provision prohibits Mages "from competing with Concentric and/or any

11
Case 2:21-cv-00937-WED   Filed 10/08/21   Page 11 of 18   Document 22

of its Affiliates … if Mages is 'selling [and/or/ marketing products or services competitive with those [Mages] sold or marketed on behalf of [Concentric] … to any of *[Concentric's] or such Affiliate's customers for which [Mages] had responsibility or which [Mages] had regular contact[.]*'" (ECF No. 21 at 7-8) (emphasis in original). Mages contends that this subsection of the Non-Competition provision does not apply to her because sales and marketing were not her principal business functions for Concentric. (ECF No. 17 at 15.) But even if it did apply, she contends, the non-compete is unenforceable because it would prohibit her from rendering services to a competitor of any present or future parent, subsidiary, or other affiliate of Concentric. (*Id.* at 12-13.) Because she never worked for any parent, subsidiary, or other entity affiliated with Concentric, she argues that Concentric "has not explained why the non-compete needed to include that scope and could not have instead been limited to ABT's/Concentric's own competitors." (*Id.* at 13.)

As to Mages's argument that the subsection of the non-compete upon which Concentric relies does not apply to her because her job responsibilities included more than just sales and marketing, the issue is just whether her "principal business function" was sales or marketing, not whether that was all she did. On that issue, her job title was "Reserve Power Sales," and her principal business function (at least according to Concentric) was sales and marketing to Concentric's customers. (ECF No. 21 at 11.)

There is at least some likelihood that Concentric will prevail on its argument that the subsection upon which it relies is the appropriate subsection applicable to Mages.

As for the scope of that subsection of the non-compete, while it does prohibit Mages from rendering services to any Competitor of Concentric "or of any present or future parent, subsidiary or other affiliate" of Concentric, those services must involve "selling, marketing products or services competitive with those [Mages] sold or marketed on behalf of [Concentric] or Affiliate for whom [Mages] worked, to any of [Concentric's] or such Affiliate's customers for which [Mages] had responsibility or with which [Mages] had regular contact[.]" (ECF No. 5-1, ¶ 5(i).) The provision's text supports Concentric's interpretation, and there is at least some likelihood that it represents the provision's correct construction. *Cf. Farm Credit Servs. of N. Cent. Wisconsin, ACA v. Wysocki*, 2001 WI 51, ¶ 9, 243 Wis. 2d 305, 312–13, 627 N.W.2d 444, 448 ("[Covenants not to compete] will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires ….").

This construction undermines Mages's and American Power's argument that "the scope [of the Non-Compete provision] is harsh and oppressive and contrary to public policy purposes of the fourth and fifth [requirements]." (ECF No. 17 at 13.) Moreover, given that Mages had access to confidential information about Concentric's products and customer identities, Concentric's construction also suggests that the provision may be reasonably necessary to protect Concentric's business interests. *See, e.g.*, *Wiemerslage*

*v. Astec, Inc.*, No. 11-CV-383-WMC, 2012 WL 12995758, at *4, 2012 U.S. Dist. LEXIS 205400, at *11-12 (W.D. Wis. May 7, 2012) (concluding that the court could "not find that a restrictive covenant was not reasonably necessary" where the former employee had "unique access to and familiarity with the market for asphalt equipment, the names of customers likely to require that equipment, and knowledge of the prices typically offered by [the employer]."). In all, there is at least some likelihood that Concentric will prevail in proving that the Non-Compete provision is reasonable.

Concentric alleges that Mages breached the Agreement by

(1) failing and refusing to return Concentric's confidential information upon her resignation and upon demand by Concentric; (2) soliciting Concentric's Protected Customer, TDS Telecom, within approximately six months after her resignation from Concentric; and (3) servicing TDS Telecom for APS, a Competitor as defined in Section 5 of the Employment Agreement, in competition with Concentric.

(ECF No. 5 at 13.) Mages and American Power argue that Concentric has not presented evidence to support the first allegation and that the emails it offers in support of the second and third allegations do not show that Mages "solicited" or "serviced" TDS. (ECF No. 17 at 14-16.)

Compared with Concentric's unsupported allegations to the contrary, Mages's declaration (ECF No. 18), her February 3, 2021 email to Concentric (ECF No. 18-1), and the photos of her Concentric files in her Concentric office (ECF No. 18-2) strongly suggests that Mages did not fail and refuse "to return Concentric's confidential information upon her resignation and upon demand by Concentric." Moreover, given

14
Case 2:21-cv-00937-WED    Filed 10/08/21    Page 14 of 18    Document 22

the preexisting relationship between TDS Telecom and American Power (*see* ECF No. 19) and the fact that Mages only exchanged a couple of emails with TDS to *cancel* an order with American Power, it is unclear how Concentric could successfully show that Mages was "soliciting" and "servicing" one of its customers. Responding to an email from a customer inquiring about the status of an order arguably can be deemed "servicing" that customer. But when it leads to the customer canceling the order for the Competitor, absent evidence that the brief communication between Mages and TDS led to TDS placing additional, subsequent orders with American Power through Mages, the emails are not evidence of a breach of the non-compete.

While the "some likelihood of succeeding on the merits" standard may represent a "low threshold," Concentric's bald allegations and the inconsequential email thread between Mages and TDS are not enough to establish a breach of the non-compete. Concentric has not shown that it has some likelihood of success in proving that Mages breached her Employment Agreement and has consequently failed to show that its breach of contract claim has some likelihood of succeeding on the merits.

The same can be said about Concentric's tortious interference with contract claims. Concentric argues that American Power "interfered with its contractual relationship with Mages by employing Mages in a capacity that violates her non-solicitation and non-compete obligations to Concentric." (ECF No. 5 at 14.) It also argues that American Power "through Mages" interfered with its contractual

relationship with TDS Telecom. (*Id.*) As Mages and American Power note, Concentric's first argument is "conditioned entirely on Mages breaching an enforceable restrictive covenant." (ECF No. 17 at 16.) Because Concentric has not shown a likelihood of success on its claim that Mages has breached the Employment Agreement, there is no likelihood that Concentric's first argument will be successful on the merits.

As for Concentric's argument that Mages and American Power interfered with its contract with TDS, Concentric claims that "APS, through Mages, interfered …by fulfilling purchase orders for [TDS's] battery needs." (ECF No. 5 at 14-15.) However, it has presented no evidence that Mages fulfilled purchase orders for TDS. The only evidence presented is that she facilitated the cancellation of an order by TDS. So even if Concentric had an existing or prospective contract with TDS, Concentric has not produced evidence that American Power, through Mages, interfered with such a contract. Therefore, Concentric's argument that American Power and Mages interfered with its contract with TDS has little, if any, likelihood of being successful.

Concentric has not shown that either its breach of contract claim or its tortious interference with contract claims have some likelihood of succeeding on the merits. That alone is grounds enough to deny its motion. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am. Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) ("To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements…. If the court determines that the moving party has failed to demonstrate

16
Case 2:21-cv-00937-WED Filed 10/08/21 Page 16 of 18 Document 22

any one of these three threshold requirements, it must deny the injunction."). However, this court will still briefly address Concentric's claims that it "has already and will suffer irreparable harm" and that it has no remedy at law. (ECF No. 5 at 15-17.)

### 3.1.2 Irreparable Harm and No Remedy at Law

Concentric claims that it has suffered irreparable harm because its relationships with its customers have been "damaged." (ECF No. 5 at 15.) Mages and American Power respond that there was no such damage. The fact that "Concentric did not obtain TDS's business in one instance—or in any future instance—does not mean the client relationship is lost and may never be retrieved." (ECF No. 17 at 18.) Mages and American Power also point out that Concentric has not presented any evidence to show that it suffered such damage. (*Id.*) The only evidence of harm, they argue, is instead Concentric's loss of $864 on the purchase order that was the subject of the TDS emails. (*Id.*)

As the moving party Concentric must show that it is has suffered irreparable harm. *See Girl Scouts*, 549 F.3d at 1086. It has not done so here. Indeed, there is no evidence that Concentric's relationships with its customers have been "damaged" or that its business prospects otherwise have been harmed. Concentric's argument that it has no adequate remedy at law because "no dollar value can be placed on the loss of business to Concentric or its damaged relationship with its customers" fails as a result.

(ECF No. 5 at 16.) If anything, Concentric can recover whatever dollar amount it lost on the TDS purchase order as damages later in this lawsuit.

Concentric has failed to satisfy the three threshold requirements for granting a temporary restraining order or a preliminary injunction. *See Girl Scouts*, 549 F.3d at 1086. As such, there is no need for the court to proceed to the second phase of the analysis. *See id.*

**IT IS THEREFORE ORDERED** that hat the plaintiff's motion for a temporary restraining order and a preliminary injunction (ECF No. 5) is denied.

Dated at Milwaukee, Wisconsin this 8th day of October, 2021.

WILLIAM E. DUFFIN
U.S. Magistrate Judge